Judgment rendered July 16, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,309-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                     Appellee

versus

CHRISTOPHER MCKNIGHT                    Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 393,736

Honorable Ramona L. Emanuel, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Chad M. Ikerd

CHRISTOPHER MCKNIGHT                   Pro Se

JAMES E. STEWART, SR.                 Counsel for Appellee
District Attorney

SENAE D. HALL
ERIC M. WHITEHEAD
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and ELLENDER, JJ.

**ELLENDER, J.**

A unanimous jury found Christopher McKnight ("McKnight") guilty as charged for the second degree rape of his 17-year-old daughter, C.M., which occurred the night before her graduation from high school. McKnight was subsequently adjudicated a fourth-felony offender and sentenced to life in prison without benefit of parole, probation, or suspension of sentence. McKnight appeals his conviction and sentence, arguing the evidence presented at trial was insufficient to prove the elements of second degree rape. He also claims the trial court committed manifest error for failing to arraign him on the habitual offender bill of information and for failing to advise him of his right to remain silent at that hearing. Finding no merit in these arguments, we affirm McKnight's conviction and sentence.

### FACTS

According to C.M.'s testimony at trial, McKnight came to Shreveport from Baton Rouge the weekend of May 13, 2022, to attend her high school graduation. The evening before the ceremony, at the request of her mother, McKnight dropped C.M. off with her boyfriend so the two could go on a dinner date. Just before midnight, McKnight told C.M. to have her boyfriend bring her to him at the Raceway on Hearne Avenue. After he picked C.M. up, McKnight asked her if she wanted him to buy her an alcoholic beverage, which she declined. McKnight then told C.M. he was tired and needed to rest for about 30 minutes, and he took her to the Cajun Inn, where he rented a room with two double beds. C.M. stated she initially sat down on the bed opposite McKnight's, moving to her father's bed only after he asked her to, so they could catch up. McKnight got closer, then put his arms around C.M., and asked her to kiss him, which she refused to do.

She stated McKnight then got on top of her, held her down, and, despite her repeated requests that he let her go, proceeded to rape her. McKnight performed oral sex on C.M., pushed her head into his lap, forced her to perform oral sex on him multiple times, vaginally penetrated her three or four times with his penis, and made vulgar comments about the pleasure he was deriving from the encounter. C.M. stated she was crying and loudly begging her father to stop throughout the rape.

C.M. testified that after her father penetrated her vaginally, he told her to be quiet and went to the bathroom. She then enabled the voice recorder on her cell phone, capturing over 11 minutes of the encounter with her father. On the recording, McKnight repeatedly asked his daughter to perform oral sex on him, if he made her feel good while performing oral sex upon her, to keep the encounter between them, if C.M. was going to be "weird" around him going forward, and telling her he had never had a sexually transmitted disease. The recording also captured McKnight apologizing to C.M., and C.M. can be heard crying, telling her father she did not want to perform oral sex on him, and asking him to please take her home to her mother. C.M. identified the recording during her testimony and it was entered into evidence without objection.

C.M. testified that after she got home, she called her boyfriend and told him her father raped her; she also called her best friend, I.W. Approximately a week later, at the urging of I.W., C.M. told her mother about the rape. After telling her mother, C.M. memorialized the encounter in a journal entry, stating she did not want to forget any of the details. The journal entry, which contained the same version of events she testified to, was entered into evidence without objection. After her mother called the

2

police, C.M. said she and her mother gave statements to the officers, and she texted her father, telling him her mother knew about the rape. Copies of the text messages between C.M. and McKnight were entered into evidence without objection.

C.M.'s mother, Yasheka Walker ("Walker"), testified McKnight was her ex-husband and C.M.'s father, and he was in Shreveport for their daughter's graduation. Walker said once C.M. shared with her the journal entry about the rape, she immediately contacted the police, and an officer with the Shreveport Police Department ("SPD") took statements from her and C.M. Walker stated she also provided the responding officer with screenshots from the Life 360 app installed on her cell phone, which she used to keep track of C.M.'s location. The screenshots indicated C.M. had been at 2842 Queens Highway in Shreveport (the location of the Cajun Inn) from 11:54 p.m. until 12:26 a.m. on May 13, 2022. The screenshot of Life 360 was entered into evidence without objection.

Duranczyk Newton, Jr. ("Newton") testified he was C.M.'s boyfriend in May 2022. Newton said the night before C.M.'s graduation her father dropped her off with him so they could go on a date, then afterward Newton brought C.M. to McKnight at the Raceway on Hearne Avenue at his request. Just a few hours later C.M. called him and was crying so much he could not understand what she was trying to say. C.M. then texted Newton, telling him her father raped her.

Rachel Simmons ("Simmons") worked at the Cajun Inn as the front desk manager on the date of the incident, and testified she checked McKnight into Room 103 just before midnight for a rental period of two hours. Simmons said she provided SPD with a copy of McKnight's driver's

3

license, the invoice for the rental, and the credit card used to secure the room. Copies of these items were entered into evidence without objection.

SPD Corporal Michael Schulz ("Cpl. Schulz") testified he spoke to C.M., who told him she was raped by her father at the Cajun Inn just after midnight on May 13, 2022. The statement given by C.M. to Cpl. Schulz matched her testimony at trial. Cpl. Schulz also took a statement from Walker, and he submitted a report to the investigating detective.

SPD Sergeant Sherrie Stump (Sgt. Stump), a detective assigned to the sex crimes unit in May 2022, testified she received a report authored by Cpl. Schulz containing allegations McKnight raped his 17-year-old daughter. Her investigation included interviews with C.M., Walker, Newton, Simmons, and I.W.; verified C.M.'s location at the Cajun Inn on the date and time of the rape via Life 360; and confirmed McKnight rented a room for two hours at the Cajun Inn at the time of the rape. At the conclusion of her investigation, Sgt. Stump prepared a warrant for McKnight's arrest on the charge of second degree rape.

McKnight elected to testify in his own defense, denied raping his daughter, and maintained he always tried to be a good father to C.M. He stated he suffered from erectile dysfunction due to a stroke in 2015 and partial paralysis from two prior neck surgeries. When asked by the prosecution why he was recorded telling his daughter he never had a sexually transmitted disease in his life, he claimed he was referring to being clean from drug use. McKnight could not explain why he told his daughter to "suck him off" or to "keep it between them," but he did admit the voice on the recording was his, and he admitted to renting a room at the Cajun Inn

on the night of the rape. After less than an hour of deliberation, the jury returned a verdict of guilty as charged of second degree rape.

Several months prior to sentencing, the state filed a habitual offender bill seeking to establish McKnight's status as a fourth-felony habitual offender. At the habitual offender hearing on March 5, 2024, Vickie Masters with the Louisiana Department of Public Safety and Corrections, Office of Probation and Parole ("PPO Masters"), testified McKnight had been supervised several times by state probation, beginning in 2010, again in 2012, and most recently in 2016. In 2016, as the result of three guilty pleas, McKnight was convicted in the 19th Judicial District on three separately billed felony charges, resulting in one conviction for simple burglary of an inhabited dwelling and two convictions for simple burglary; these felony convictions were used as the predicate offenses for McKnight's habitual offender bill. PPO Masters testified McKnight's probation supervision for those three cases terminated on March 28, 2020. She also confirmed the period of time between the closure of the three felony burglary cases and his conviction for second degree rape was almost four years.

SPD Sergeant John Madjerick ("Sgt. Madjerick") was accepted as an expert, without objection, in fingerprint examination and analysis. He testified records from McKnight's prior convictions matched the fingerprints he obtained from him in open court that day.

C.M. then read her victim impact statement to the court, and McKnight elected to testify in his own defense, also entering his medical records into evidence. The trial court found the evidence presented warranted McKnight's adjudication as a fourth-felony habitual offender and sentenced him to serve life in prison without the possibility of parole,

5

probation, or suspension of sentence, stating any lesser sentence would deprecate the seriousness of the second degree rape. The trial court advised McKnight of his right to appeal within 30 days, and it advised him he had a right to seek post conviction relief, though it did not specify a time period within which McKnight could file such pleadings.

McKnight now appeals his conviction and sentence, challenging the sufficiency of the evidence underlying his conviction for second degree rape and the trial court's failure to advise him of his rights at the habitual offender hearing.

**DISCUSSION**

McKnight contends the evidence presented by the state was insufficient to support a conviction for second degree rape because the state failed to prove C.M. was prevented from resisting the act by force or threats of physical violence. McKnight argues the acts of moving his daughter's head down and putting his penis into her mouth were not so forceful as to prevent C.M. from resisting the act, and he asserts the jury instructions given by the trial court and verdict form were insufficient because both failed to include a complete definition of second degree rape. McKnight further argues the evidence presented by the state supports a conviction for third degree rape, and he asks this court to vacate his conviction and remand the case to the lower court for sentencing consistent with a finding of guilt for third degree rape.

McKnight also contends the trial court erred in adjudicating him to be a fourth-felony habitual offender by failing to arraign him on the habitual offender bill of information, and by failing to advise him of his right to a formal hearing, his right to require the state to prove his habitual offender

6

status, and his right to remain silent. He contends the trial court's failure to properly advise him of these rights under the habitual offender law constitutes an error patent and requires the adjudication to be vacated because he claims he never would have testified at the habitual offender hearing had the trial court advised him of his right to remain silent. McKnight also argues the trial court erred in allowing C.M. to read her victim impact statement during the "evidentiary" portion of his habitual offender hearing.

### *Sufficiency of the Evidence*

When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. *State v. Hearold*, 603 So. 2d 731 (La. 1992). If the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal and the reviewing court must then consider the assignments of trial error. *Id*. The relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *State v. Ramsey*, 55,491 (La. App. 2 Cir. 2/28/24), 381 So. 3d 308, *writ denied*, 24-00379 (La. 10/1/24), 393 So. 3d 865.

This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Middleton*, 55,634 (La. App. 2 Cir. 5/22/24), 386 So. 3d 1283, *writ denied*, 24-00822 (La. 2/19/25), 400 So. 3d 926. The appellate court does not assess the

7

credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *Middleton*, *supra*; *State v. Bass*, 51,411 (La. App. 2 Cir. 6/21/17), 223 So. 3d 1242. A reviewing court affords great deference to a trial court's decision to accept or reject the testimony of a witness in whole or in part. *Middleton*, *supra*; *Bass*, *supra*.

It is the province of the fact finder to resolve conflicting inferences from the evidence. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness—if believed by the trier of fact—is sufficient to support the requisite factual conclusion. *Middleton*, *supra*. Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence. This is equally applicable to the testimony of sexual assault victims. *Id*.

Second degree rape is committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed when the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape. La. R.S. 14:42.1(A)(1).

C.M.'s testimony at trial established McKnight maintained physical control over his daughter while they were in the hotel room. He held C.M. down and performed oral sex on her while she begged him to stop, forced his penis into her mouth, and physically flipped her onto her stomach and penetrated her vaginally with his penis. Her testimony was corroborated by her journal entry, her disclosure to her mother, her statement to her boyfriend, and her statement to the police. C.M.'s cell phone data also corroborated her testimony, and Simmons' testimony further bolstered

8

C.M.'s credibility as she was able to identify and authenticate McKnight's driver's license, the credit card he used to secure the hotel room, and the invoice for his two-hour room rental at the date and time of the rape. Finally, the voice recording from C.M.'s cell phone included several statements made by McKnight referring to the sexual encounter he forced on his daughter, as well as her crying, begging to go home, and him apologizing to her.

This evidence overwhelmingly supports the state's position that C.M. reasonably believed any further resistance would be futile, but we would be remiss if we did not discuss one of the most disturbing facts in this case: that McKnight is C.M.'s father. Louisiana law thoroughly addresses the relationship between a parent and child, stating in no uncertain terms the obligations of parents to raise, care for, and direct the raising of their children. Parental authority includes rights and obligations of physical care, supervision, protection, discipline, and instruction of the child, and it details a parent's obligation to support, maintain, and educate their child. La. C.C. arts. 223 and 224. Parents also have an obligation to provide moral, social, and material direction for their child. La. C.C. art. 226. Further, a parent maintains physical control over a child, and a child is prohibited from absenting himself from his family home without the permission of his parents. La. C.C. art. 227. Parents undeniably hold a position of psychological authority over their children. *See also*, *State v. Lathan*, 54,181 (La. App. 2 Cir. 1/12/22), 334 So. 3d 463. In addition to the statutory rights, responsibilities, and obligations owed by parents to their children, it shocks the conscience on every possible level that a father would violate the trust of his own child in the most demeaning way possible.

9

The evidence presented by the state makes McKnight's abuse of his psychological authority over C.M. painfully obvious. McKnight, as C.M.'s father, ensured his daughter, who was only 17 years old, was reliant on him for transportation home from her date, and directed her to have her boyfriend bring her to him rather than take her home to her mother. He pressured her to consume alcoholic beverages. When she declined, McKnight took his daughter to the Cajun Inn, rented a room for two hours, and proceeded to force her to engage in sexual activity as she cried and begged him to stop. Considering these facts in a light most favorable to the prosecution, any rational trier of fact could conclude McKnight's use of force, both physical and psychological, and the extent to which C.M. resisted, satisfied the elements necessary for a conviction of second degree rape. This assignment of error lacks merit.

### *Habitual Offender Hearing*

Despite making no contemporaneous objection to the trial court's failure to arraign him on the habitual offender bill or its contents, McKnight contends the trial court erred in failing to arraign him prior to his habitual offender hearing. He also argues the state failed to advise him of his right to a formal hearing, his right to make the state prove he was a habitual offender, and his right to remain silent. McKnight asks this court to vacate his adjudication as a fourth-felony offender and remand this matter to the trial court for resentencing.

The trial court is required to advise a defendant of the specific allegations contained in the habitual offender bill of information, his right to a formal hearing, his right to require the state to prove his identity as a multiple offender, and his constitutional right to remain silent. La. R.S.

15:529.1(D)(1)(a); *State v. Butler*, 56,110 (La. App. 2 Cir. 2/26/25), 408 So. 3d 1052. However, the failure to advise a defendant of these rights is considered harmless error when the defendant's habitual offender status is established by competent evidence offered by the state at the hearing rather than by admission of the defendant. *State v. Simpson*, 55,304 (La. App. 2 Cir. 11/15/23), 374 So. 3d 1056, *writ denied*, 23-01641 (La. 5/29/24), 385 So. 3d 703; *State v. McKeever*, 55,260 (La. App. 2 Cir. 9/27/23), 371 So. 3d 1156, *writ denied*, 23-01429 (La. 4/16/24), 383 So. 3d 149.

McKnight correctly asserts he was not arraigned on his habitual offender bill, and was not advised of his right to have a formal hearing on his status as a habitual offender, his right to make the state prove his status as a habitual offender, or his right to remain silent. However, McKnight was adjudicated to be a fourth-felony offender after a hearing during which the state established his prior felony convictions through sworn testimony and evidence, without reliance upon what McKnight said at the hearing. McKnight did not stipulate to his prior convictions, nor did he plead guilty to being a habitual offender. Rather, PPO Masters and Sgt. Madjerick established McKnight's three previous felony burglary convictions from the 19th Judicial District Court. PPO Masters further testified less than five years lapsed between the termination of McKnight's probation for his burglary convictions and his conviction for his fourth felony, the second degree rape of his daughter. This evidence was sufficient to warrant the trial court's adjudication of McKnight as a fourth-felony habitual offender, and it negates his claim that the failure to advise him of certain rights is reversible error.

11

### *Improper Admission of Testimony at Habitual Offender Hearing*

McKnight filed a pro se assignment of error alleging C.M.'s victim impact statement and his own testimony were improperly allowed during the evidentiary portion of his habitual offender hearing. While the transcript of the hearing does not show a clear break between the evidence taken to establish McKnight's status as a fourth-felony offender and the sentencing portion of the hearing, no contemporaneous objection was made to C.M.'s testimony. La. C. Cr. P. art. 841. Even if this was error, it is clearly harmless. Further, as previously discussed in detail, it is abundantly clear the state adequately proved McKnight's three prior felony convictions and established the underlying second degree rape as his fourth felony conviction through PPO Masters and Sgt. Madjerick, as required by La. R.S. 15:529.1, without regard to McKnight's testimony. This assignment of error lacks merit.

### *Jury Instructions and Verdict Form*

McKnight also asserts a pro se assignment of error challenging the sufficiency of the evidence, containing within it an alleged error with the jury instructions and verdict form. However, as no contemporaneous objection was made, this argument was not preserved for appeal. La. C. Cr. P. art. 841. Regardless, a review of the record reveals no reversible error. Counsel for McKnight and the state were able to offer their input and objections before the court finalized the jury instructions. The trial court then read these to the jury prior to deliberation, and they included a recitation of the definition of second degree rape. The same complete definition of second degree rape was printed on the verdict form provided to the jury. This assignment of error lacks merit.

***Errors Patent***

In accordance with La. C. Cr. P. art. 920, the record has been reviewed for errors patent. As we previously noted, the trial court's failure to advise McKnight of his constitutional rights at the habitual offender hearing was harmless error.

We also note La. C. Cr. P. arts. 821 and 853 require the trial court to rule on motions for new trial and post-verdict judgment of acquittal prior to imposing a sentence, which did not happen in this case. However, these motions were not filed until after sentencing, making it impossible for the trial court to rule on them in compliance with these articles. Obviously, the timing of the trial court's rulings on McKnight's motions for new trial and post-verdict judgment of acquittal does not constitute error patent, and does not warrant a remand by this court.

Finally, while McKnight was advised that he could seek post-conviction relief, the transcript does not reflect he was advised of the time period in which to do so. La. C. Cr. P. art. 930.8(C), which requires the trial court to inform the defendant of the limitations period for filing an application for post-conviction relief, is supplicatory language that does not give an enforceable right to an individual defendant. *State v. Patterson*, 51,559 (La. App. 2 Cir. 9/27/17), 244 So. 3d 733; *State v. Williams*, 34,936 (La. App. 2 Cir. 9/26/01), 795 So. 2d 1221. The failure to advise a defendant of these rights is not grounds to vacate the sentence and remand for resentencing. *Patterson*, *supra*; *Williams*, *supra*; *State v. Morvan*, 31,511 (La. App. 2 Cir. 12/9/98), 725 So. 2d 515, *writ denied*, 99-0186 (La. 5/28/99), 743 So. 2d 659.

Accordingly, we hereby advise the defendant that no application for post-conviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under La. C. Cr. P. arts. 914 or 922.

**CONCLUSION**

For the reasons set out above, Christopher McKnight's conviction and sentence are affirmed.

**AFFIRMED.**